McWilliams? Yes, I'm here. And Mr. McGowan? Yes, I'm here. And Mr. Lynch? Yes, I'm here. Okay, please call the case. Case number 20-1020, the District of Nebraska, United States v. Anthony Hanel. And case number 20-1023, the District of Nebraska, United States v. Courtney Clark. Okay, Mr. McWilliams, proceed. Yes, Your Honor, thank you. May it please the court, my name is Rich McWilliams, and I represent one of the appellants in this case, Anthony Hanel. The issue before the court today is whether a no-record return on NCIC creates reasonable suspicion to stop a vehicle where three facts about that check are true. First, that it was not yet complete or full. Second, that it didn't account for state-by-state discrepancies within the NCIC system. And third, whether it wasn't even the actual basis for the stop in the first place. And I think it's this third factor that makes the case so maddening, in that the government is trying to meld two lines of cases to get a favorable result. The first line of cases where the police have pulled someone over for the wrong reason, or for a reason that doesn't later pan out. And then secondly, the line of cases where they are depending upon errors from computer or dispatch systems in order to later justify a stop. I think that the essence of this case comes down to the details of the NCIC system and why this court should not find that a no-records check under these circumstances yields or creates reasonable suspicion. Counsel, in that regard, do we know whether a report of not on file from the NCIC means that there is something unlawful about the vehicle's registration, or just that it isn't showing up on the system? It seems to me that's a key fact. I think it is a key fact, your honor, and I think it's the latter. I think that when these officers testified that given their experience, particularly with regard to entering out-of-state plates, that they knew that a no-record return could come back in the computer system, and that could simply mean that some sort of data had not been entered in to retrieve the data correctly, that it's not necessarily indicative that... Go slowly, counsel, because Judge Gross' question was about the not on file. That's the first reply, right? Correct. And the second reply is no record, right? Correct. Well, yes, your honor. Yeah, yeah, they're different, and they're different words. Does the record explain the difference in those two? I don't believe so. I believe that the officers treated those two as functionally the same reply. That is, that in their world, there was a valid plate on file, and then everything else. And I don't believe that they treated those as being distinct. But in any event, neither of those two returns, I think, provide them with indicia that there is something illegal going on. I believe that they both testified that in their experience, particularly with out-of-state plates, that was simply an indication that they needed to delve further to try and find the record. And indeed, both of them testified that it was common practice, protocol indeed, for them in that situation to check it a couple times and then resort to calling dispatch, who was better trained at finding out-of-state plates. And it's true that both of those occurred before the stop, right? That is, the officers in the cruiser had searched on the computer two times before the lights were on. Right. Correct. Thank you for the timeline, but I was a little confused by the timeline because I don't think it has the two ahead of time. But don't worry about that. Proceed. Thank you for the timeline. Yes, Your Honor. Computers are not magic. And I think that there is a recurring theme throughout the government, jurisprudence, that they want to treat certain things as magic. They want dogs to be magic. They want computers to be magic. Where if they get a word from a computer that something is true, that they can then rely upon that. And I think that the Dappolito First Circuit case explains why that's foolhardy. Even a footnote, they quote Justice O'Connor's opinion in Arizona v. Evans, where she points out computers are a great resource to the police. They should use them, but they should not rely upon them blindly. And that's what you have here today. I have misspoken. You don't have that here today because the two officers in this case were never relying upon the computer to pull the car over, which is again why the case is so maddening. It's asking the court to resolve a hypothetical situation. Had the officers actually relied upon the computers... Counselor, don't we have many, many, many cases from this court and the Supreme Court that say that the subjective view of the officer doesn't matter. It's an objective view of the situation. It's... So how do you reply to that? It's true, Your Honor. I don't think the question is improperly before the court. But it does ask the court to consider and take into account things that simply didn't exist. You don't have officers testifying, oh, I pull cars over for not having a record all the time, and there's not even really a fully fleshed out examination ever of what NCIC is because the reason in real life that they pulled the car over was because they had made a mistake previous to that in thinking that the car had committed a lane change violation. Counselor, there's really... There's nothing unreasonable about officers relying on computers. It really depends on what the information means that they were told, doesn't it? I mean... It depends on what these words mean, not on file and not on record. Let me ask this question. Can objective reasonableness be based on lack of evidence of compliance rather than evidence of noncompliance? I don't believe so. And I think that's a very poignant way of putting it out. In this case, both officers testified that they knew that the system was complicated with regard to out-of-state plates. They knew it was, to use one of my kids' terms, glitchy with regard to out-of-state plates. They knew that there were problems in terms of what expiration date. So it seems like these two officers and the Omaha Police Department writ large would understand that when you are dealing with an out-of-state plate, particularly one that appears to be facially valid and is indeed actually valid, that you can't simply rely upon a return of no record or not on file. You don't think that amounts, counsel, to arguable reasonable suspicion or something of... What level do you think it is? It's some level of reasonable suspicion. You think it's never reasonable suspicion? I think it is... If we were to equate them, it is maybe alongside the hunch. Something that warrants further investigation to get to the level of reasonable suspicion. I don't believe that given the facts of this case and what these officers know about NCIC, it rises to the level of reasonable suspicion. And in this case, the government even concedes in their brief that if the officers had entered in the expiration year that appeared on the Minnesota license plate, it still would have returned a result of no record. So for the court to find that an NCIC return that is a lack of record as opposed to affirmative evidence of wrongdoing, that would eviscerate a major Fourth Amendment protection for interstate travelers. It would basically put the Fourth Amendment freedoms of interstate travelers in the hands of a handful of police officers who know the trick to NCIC to enter in the next year for the expiration date as opposed to the present year. That's a very sophisticated argument. That really wasn't in either of the briefs here, right? Your interstate commerce argument? I'm not trying to raise... No, no, I'm being sincere. I'd have to think about that a while, but proceed with your argument. It does amount to a major evisceration of Fourth Amendment protections. Minnesota does not border Nebraska, but it's very close to Nebraska. We have a number of people traveling through here with Minnesota plates or Missouri plates, another state that they had indicated they'd had problems with before. If you allow traffic stops to turn solely upon no return or no record on file on an NCIC, then that creates, it incentivizes undue reliance upon a computer system and incentivizes officers to not learn the tricks to get to the correct... Well, now, counsel, was there a record made here, because Missouri has this variable deal where the number of years depends on, oh my goodness, how old the car is, and I won't get into detail. You don't need to hear that. But what you need to know is, does that effectively say you can't use registration at all when Nebraska has a statute that says you've got to have valid registration of the car to drive on our roads, period? No, and again, obviously in the record before the court, we didn't delve much into the various nuances of Missouri's car registration. No, but I mean in general for other states that have all this weird stuff. No, but I think that it does underscore the point that when you are a local city police officer and you're dealing with a national database, that you don't know where the data is inputted from and you are imperfect and imprecise in your ability to extract the data, it doesn't get you to reasonable suspicion when you type something into your magic box and it doesn't produce the precise information that you want it to. You have to understand the limitations of the tool. You have to understand that you personally, as an officer, possess an imperfect understanding of every state's car registration scheme. You possess, I mean indeed the officers in this case testified, they didn't know how the data from other states DMV, yes your honor. No, no, I just wanted to, I was getting ready to tell you, you're in your rebuttal and I notice you all have allowed extra time for rebuttal. Yes, I will stop talking. I'll stop there. Then we're to Mr. Lynch. Thank you, your honor. May it please the court, opposing counsel, my name is Sean Lynch and I represent the affilee of the United States of America in this matter. This case involves officers of the Omaha Police Department conducting multiple data checks using the information that was displayed on a suspect vehicle's license plate. The officers used a law enforcement database that they are trained in using, that they are familiar with, and that they have been found to be reliable in the past. These repeated checks all returned the same result, that the vehicle's license plate was not on file. The district court properly denied the appellant's motion to suppress. The legal conclusions drawn by the district court are subject to and easily survived an over review. The district court's factual findings are not clearly erroneous and are in fact well supported by the record. It's for these reasons that this court should affirm the district court's denial of the defendant's motion to suppress. Counsel, let me go ahead and just jump right in. So, do we know from the record what not on file means? Does that mean, is that evidence of some unlawful activity or just that it's not showing up? Your honor, while it was never explicitly asked and answered in such a manner, the district court's order took that to mean that the vehicle did not have valid registration and that's also consistent with references that the officers made in their testimony at trial. Did the district court cite any authority for that proposition? No, your honor, but I would direct the court to... Was there anything in the record to support that? Your honor, when asked about this or when discussing this, Officer Harney on page 16, lines 14 and 17 stated, my partner had what is our information check of the registration on the plate via the police radio in the car. So again, not explicitly asked and answered in such a manner, but the references have been to valid registration. And what about the other thing, the not on file, then the no record? How much evidence is there about what that means or what did the district court say? About either of those two phrases, I understand those are the two specific phrases that came back. Your honor, I don't think that was necessarily explicitly answered in such a manner. I think that the district court and the parties used it in such a manner that was no record and no registration were interchangeable, that the license plate wasn't on file so they couldn't verify the registration. And I can't resist asking the horrible question. About every Missouri plate, even if you just came from getting it in Rockport, which is, you know, right next to Nebraska there, and those states do borders, you know. About every Missouri car can be stopped because goodness gracious, we've got a system where you can't tell what the expiration date is, even if you get the notice from the vehicle people. It's like reading a code about when your expiration is and how long it's good for. So you could stop every Missouri car, and maybe true of Minnesota too. So what do you say to that horrible? Well, certainly your honor, I think that the officers in this case had the training and experience that there is issues with Missouri plates and that they've learned to account for that. They have not encountered that specific issue with Minnesota plates. Did they say that on the record? I know they said Missouri, did they say it about Minnesota though, that they hadn't had that problem with Minnesota plates? Yes, your honor. They affirmatively said that? I believe so, your honor. No, no, no, yes is a good answer, true, go ahead. Yeah, I believe that what the officers had said is they had not encountered it with Minnesota plates. Now there could be multiple interpretations of that. I would hazard a guess that these officers have encountered Minnesota plates while in Nebraska, but they testified that they had not encountered that issue specifically with Minnesota plates. And certainly when it comes to these traffic stops or traffic stops where officers are observing what they believe to be traffic violations, the case law is well established that there's probable cause for a traffic stop if the officers observe any traffic violation, no matter how minor. But even if we don't, if the court does not find that there's probable cause for the traffic stop and instead applies a reasonable suspicion standard, the government would still succeed under that standard for the officers to be justified in stopping the vehicle. And I think that dovetails with what Mr. McWilliams said in response to questioning by this court, that it would warrant further investigation. And that's the particular point of reasonable articulable suspicion, is for the officers to investigate further to confirm or dispel their belief that a violation of the law may occur. Let me ask you the same question then. Is there a difference legally between evidence of noncompliance and lack of evidence of compliance for reasonable suspicion? In this particular circumstance, Your Honor, I don't believe so. And the reason I say that is for vehicles to be operating on the road in the state of Nebraska under state law has to have valid registration and compliance with the Motor Vehicle Registration Act. So noncompliance would be a violation, and lack of evidence of compliance would also be indicative of a law violation. So let me ask you this hypothetical, and I'm not sure it's a perfect analogy, but let's suppose I'm in a jurisdiction where concealed carry is legal. And an officer sees me walking down the street, and based upon my clothing, he thinks I'm carrying. And so he looks on a database to see whether I've got a license to concealed carry, and it comes back no record. Is that reasonable suspicion to stop me? Based on just clothing alone, Your Honor, I don't believe so. Well, there's a lump under my jacket he thinks I'm carrying. Your Honor, I think there would be other factors that would be required in that scenario. In this particular situation, the officers clearly have information that's readily visible that they can verify. And based on that, they found that there was no record on file. In the situation with carrying a concealed weapon, I think that the difficulty would be, one, how the officer would know who that individual was. And if the officer made contact with the individual, at least under Nebraska law, the individual would have to immediately disclose that they have a concealed carry weapon. If the officers are seeing just a bulge, I think then the other surrounding factors would be necessary to determine whether or not that officer's reasonable suspicion was sufficient to stop that individual to investigate further. Of course, the reason for my question gets back to the evidence of noncompliance versus lack of evidence of compliance. Yes, sir. Your Honor, I think that in regards to the case that was raised by the appellants from the First Circuit in Dappolito, there's a good distinguishing factor that the First Circuit recognized in that case in situations where it's just reasonable suspicion with someone standing on the street or in situations where the officers knew that that individual had a valid warrant. I think this situation is more akin to that scenario where the officers had affirmative reasons to believe that a violation of the law was occurring. And again, my answer would still be that noncompliance or evidence of lack of compliance would still be the same as far as justifying the stop under a reasonable suspicion standard. And in regards to that, Your Honors, the District Court made particular findings that the NCIC database is reasonable, that the officers were trained in its use and how to use it. And in regards to what the appellants have raised in their briefs, one of their issues is that the officers did not wait for dispatch to come back with an NCIC check. That's not necessary for the officers to stop the vehicle. Certainly, one check of the vehicle's registration on NCIC would be sufficient to warrant stopping the vehicle. A second check just adds to that reasonable suspicion. And the third database check coming back from the information channel by dispatch occurred prior to making contacts with the individuals, Mr. Handel and Ms. Clark, which is similar to prior case law from this court in regards to mistakes that may have occurred in transit plates. But certainly, dispatch returned the same result that the officers did, given the information that was readily displayed on the plates. Granted, the registration was ultimately wrong, but the officers can't check vehicle identification numbers while the vehicles are traveling 65 miles per hour down the freeway. So for all these reasons, Your Honors, I would ask that this court affirm the decision of the District Court denying the appellant's motions to suppress. The findings of fact were not clearly erroneous. This case clearly would pass under a de novo review for the law violations. And if there aren't any other further questions, I would submit the matter to the court. Mr. Lynch, I see no further questions. So thank you for your argument. And I understand Mr. McGowan is going to go first here. I thank you for the nod, Mr. McWilliams. So, Mr. McGowan, please proceed. Thank you, Your Honors. My name is Richard McGowan, and I represent the interests of the co-appellant, Courtney Clark. I obviously joined in Mr. McWilliams' arguments. In addition to that, on rebuttal, very briefly, a couple of things. Mr. Lynch referenced the in-transit cases. I know that one of those was the Miranda-Sotolago case from the Seventh Circuit. Part of the testimony was that the temporary vehicle tag was, quote, unlike any Indiana registration tag that the officer who stopped the vehicle had ever seen. Here, there was no evidence that Durango's Minnesota license plate was unlike any other Minnesota license plate that the officers had seen. And because of the proximity to Nebraska and Minnesota, I would submit that the officers are familiar with what Minnesota license plates look like. It's much more difficult to forge a license plate than it would be in transit. I'm sure we're all accustomed to seeing some homemade in-transit signs that look suspect, just as we're driving around where people hand it right in. Another thing, I would direct the court to page 31, lines 2 to 4 of the transcript from the hearing. Our attorney on cross-examination, quote, said he didn't know if Minnesota was one of the states where you had to enter in the expiration year or not. It's important to bear in mind that the default for the system that they were using just had the current year, not the expiration year on it. I understand that, but if you just keep reading the next two lines, Officer Harney also says that he had never had any problem with any Minnesota plates in the past, and then he volunteered that Missouri is a huge problem, which would confirm what Judge Benton had said. But at the end of the day, what I keep coming back to is pretty straightforward to me. I sit there and I look at it. The officers run twice the plate. They've come back that there's some problem with it. I think that trying to say that a reasonable officer ought to be debating in his brain whether a lack of compliance evidence is the same as evidence of noncompliance. I mean, that's imposing a pretty high legal sophistication on an officer who just says this vehicle is not properly registered. Nebraska law requires a vehicle to be properly registered, and so the stop ensues. Why is that wrong? He hedges as the answer was saying not off the top of my head, but I think the officer's actions speak the loudest. And most importantly, in this case, they're still checking it. They're checking it for a reason. They've checked it once. They're checking it twice. I think at some point in this, it should come to the officer's attention that if it's not coming back as registered, I've checked it once, maybe Minnesota is one of those states like Missouri where you have to enter in the number. So it's clear that they weren't stopping the car for that reason. It's clear that they did not know if that plate was good or not because they've run it twice and they're calling it a dispatch, and they're getting word from dispatch after they initiated the stop. And with that, I would yield my rebuttal. With no further questions, I would yield my rebuttal time to Mr. McWilliams. Okay. Mr. McWilliams, you have about a minute and a half left. Go ahead. One thing I think is helpful, and I've got a minute and a half, so I'm going to throw some stuff out here. If you were in a small town and you had one dispatcher and two police officers and the dispatcher was always wrong or was right only about half the time, it would come at some point where the local defense bar might say, when you call in to Darryl the dispatcher and he's wrong half the time or he provides improper information, at some point you have to start understanding that you need to do more digging before you can start pulling cars over. And I think that's what the testimony about the NCIC system conveys to the court, is that these officers know that it's an imperfect system. They don't really know where the data comes from. They are imperfect in their abilities to retrieve the data and know they are on notice that with regard to out-of-state plates, or at least non-Nebraska plates, that there at times can be problems getting to the truth of the matter, which is whether or not the car is properly registered or not. And so, you know, again, we're operating on a hypothetical world where these officers were actually pulling the car over for failure to register properly, but in this situation, there has to be some accountability to the local police, because they owe a duty to the traveling public to not pull over cars just to type their VIN in to the computer system. So I think that the motions to suppress should have been granted. I would ask the court to reverse the district court. Okay. Thank you all for your argument to the court. Case number 1020, United States v. Anthony Handel, and case number 20-1023, United States v. Clark, are submitted for decision by the court.